# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| US HF CELLULAR COMMUNICATIONS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11363-VCS |
| | : | |
| RENE STIEGLER, III and ROBERT BLOCK SURVIVORS TRUST, | : | |
| | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| SHIPCOM, LLC, | : | |
| | : | |
| Nominal Party. | : | |
| | : | |

## MEMORANDUM OPINION

Date Submitted: July 25, 2017
Date Decided: October 12, 2017

Michael W. McDermott, Esquire and David B. Anthony, Esquire of Berger Harris LLP, Wilmington, Delaware; William M. "B.J." Lyon, Jr., Esquire of Lyon Law Firm, P.C., Mobile, Alabama; and Patricia Clotfelter, Esquire of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Birmingham, Alabama, Attorneys for Plaintiff.

Geoffrey G. Grivner, Esquire of Buchanan, Ingersoll & Rooney, P.C., Wilmington, Delaware, Attorney for Defendants.

**SLIGHTS, Vice Chancellor**

Defendants, Robert Block[1] and Rene Stiegler, III, are the co-founders of ShipCom LLC, a company that specialized in maritime communications. In early 2012, Plaintiff, US HF Cellular Communications, LLC ("Cellular"), acquired an 80% interest in ShipCom LLC. The parties documented the acquisition and related agreements with respect to ShipCom in a Membership Interest Purchase Agreement dated February 23, 2012 (the "MIPA"). The undisputed record reflects that Cellular was prompted to invest in ShipCom in order to capture value inherent in a waiver ShipCom had recently obtained from the Federal Communications Commission (the "Waiver"), which allowed ShipCom to use a particular maritime frequency spectrum, typically restricted to maritime use, for emergency land-based communications.[2] The Waiver was granted exclusively to ShipCom and, by all accounts, it is quite valuable.

All was well at ShipCom until May 2015, when Block and Stiegler discovered that Cellular was making plans to exploit the Waiver outside of ShipCom and to exclude them from the potential profits. They filed suit in Alabama alleging various

---

[1] The caption on this Memorandum Opinion is the caption that appears above the First and Second Amended and Supplemental Verified Complaint for Declaratory and Injunctive Relief, filed on December 2, 2015 and November 18, 2016, respectively (D.I. Nos. 9 and 30), which removed Robert Block, individually and as trustee of Robert Block Survivors Trust as a party. I make this note because the briefing on the cross-motions is under the caption from the original Complaint, filed on August 3, 2015 (D.I. No. 1).

[2] Pl. Cellular's Opening Br. on Mot. for Summ. J. ("Cellular's Opening Br."), Ex. 3 ("Waiver").

tort theories. Cellular followed by filing suit in this Court where it seeks various declarations that Cellular breached the MIPA and related agreements.[3] Block and Stiegler then cross-claimed for counter declarations.

This Opinion resolves the parties' cross-motions for summary judgment.[4] The motions concern two aspects of the MIPA and other related agreements. *First,* the parties present differing constructions of the term "Maritime Business" within the MIPA. Specifically, the parties dispute whether the Waiver is included within the term "Maritime Business." If it is, then the MIPA provides that only ShipCom may exploit the Waiver. If it is not, then Cellular may utilize the Waiver in its businesses outside of ShipCom. *Second,* the parties dispute the viability of certain provisions of the MIPA and related agreements that grant options to Block and Stiegler to convert their ShipCom equity into Cellular equity. Block and Stiegler maintain that the options are still exercisable; Cellular argues that the options have expired.

For the reasons I explain below, Block and Stiegler's motion for summary judgment on the Maritime Business issue is GRANTED. The MIPA clearly and unambiguously provides that the Waiver is included in the definition of Maritime

---

[3] The MIPA contains a Delaware choice of forum provision for claims arising under the MIPA.

[4] Cellular filed a motion for partial summary judgment. Block and Stiegler filed a cross-motion for summary judgment. Thereafter, the parties resolved by stipulation all of the other claims and cross-claims in this action. Thus, this decision addresses all extant claims.

Business and that it cannot, therefore, be exploited outside of ShipCom. As to the option issue, Cellular's motion for summary judgment is GRANTED. Block and Stiegler failed to exercise the option in the time allowed by the relevant contracts.

## I. BACKGROUND FACTS

I have drawn the facts from the admissions in the pleadings, uncontested facts presented in the motions, the Stipulation and Order of Declaratory Judgment and those matters of which the Court may take judicial notice. Unless otherwise indicated, I have determined that these facts are undisputed.

### A. The FCC Grants the Waiver and Cellular Makes its Investment

Before 2012, Block and Stiegler owned 100% of ShipCom. ShipCom's business focused initially on operating a network that facilitated ship-to-ship and ship-to-shore communications using a spectrum of high frequency ("HF") radio waves. The FCC license that permitted ShipCom to utilize this spectrum of HF radio waves limited its use to maritime communications; the license did not permit ShipCom to use the radio waves terrestrially. That changed after Hurricane Katrina hit the Gulf Coast in 2005. Katrina knocked out much of the terrestrial communication infrastructure, so first responders turned to ShipCom's HF spectrum to coordinate their rescue efforts. The FCC temporarily authorized ShipCom to use its HF spectrum terrestrially given the exigent circumstances.

After the FCC saw the benefits of ShipCom's HF spectrum in terrestrial applications, it granted ShipCom the Waiver in 2010.[5] The Waiver allows ShipCom to use its HF spectrum terrestrially "in the event of a disaster that renders normal communications unavailable."[6] With the resulting expansion of its operations, ShipCom was suddenly an attractive investment target. Enter Cellular and its agent, Edward Bayuk. They saw the Waiver's value (later appraised at $2 billion),[7] pursued an investment in ShipCom and ultimately entered into the MIPA with Block and Stiegler. The MIPA required Cellular to pay Block and Stiegler $5 million in exchange for an 80% ownership interest in ShipCom.[8] The parties later executed the First Amended Membership Interest Purchase Agreement ("FAMIPA")[9] and a Note Payoff Letter Agreement ("Letter Agreement").[10]

---

[5] Waiver at 1.

[6] *Id.* at 3.

[7] Defs. Block and Stiegler's Opening Br. in Supp. of Mot. for Summ. J. ("Defs.' Opening Br."), Ex. J (Brattle Group, Valuation of the Spectrum Related Assets of ShipCom (July 18, 2012)); Ex. K (Letter from Brattle Group to Cellular as Addendum to July Report at 1 (Dec. 17, 2012)).

[8] Cellular's Opening Br., Ex. 1 ("MIPA") § 2.02. The MIPA also required Cellular to make substantial pre-closing payments. *Id.* at 1 (Recitals).

[9] Cellular's Opening Br., Ex. 2 ("FAMIPA").

[10] Cellular's Opening Br., Ex. 6 ("Letter Agreement").

## B. The Relevant Contract Provisions

As noted, the cross-motions for summary judgment involve only two aspects of the parties' various agreements. The first is the meaning of "Maritime Business" as defined in the MIPA. The specific issue is whether the Waiver is included in the definition of "Maritime Business." The second relates to Block and Stiegler's contractual right to options to convert their 20% interest in ShipCom into a 10% interest in Cellular (the "Option"). I address the relevant contractual provisions below.

### 1. Maritime Business

The MIPA delineated the parties' intent with regard to ShipCom's anticipated operations and Cellular's permitted operations outside of ShipCom. ShipCom retained all operations related to its "Maritime Business."[11] Cellular retained the right to pursue business opportunities in the communications space outside of ShipCom's Maritime Business.[12] Specifically, the MIPA provides:

> Simultaneous with the Closing, the Company [ShipCom] shall form an operating subsidiary with the name ShipCom Maritime, LLC in the State of Delaware, with the Chief Operating Officer to be Stiegler, to operate the portion of the business of the Company that is currently engaged in the operation of the maritime FCC licenses and Waiver, and to expand the maritime business surrounding the maritime FCC licenses and Waiver (the "Maritime Business"). The Purchaser [Cellular] intends to commence business operations in other

---

[11] MIPA at 2–3 (Recitals).

[12] *Id.*

communications related markets unrelated to the current Maritime Business by use of the new wholly-owned subsidiaries of Purchaser, and it is further the intent of the parties hereto that [Block and Stiegler] may only participate in those other entities by [] exercising their Option . . . .[13]

As stated in this clear and unambiguous Recital, the parties agreed that ShipCom (through a newly created subsidiary) would continue to operate and expand "the maritime business surrounding the maritime FCC licenses and Waiver (the 'Maritime Business')."[14]  The MIPA defines "Waiver" as the waiver the FCC granted to ShipCom in 2010.[15]  The MIPA's definition section provides that "'Maritime Business' shall have the meaning ascribed to such term in the Recitals hereof."[16]

## 2. The Options

The MIPA originally provided that Block and Stiegler had 60 days from the date of closing to exercise the Option.[17]  The parties amended this aspect of the

---

[13] *Id.*

[14] *Id.*

[15] *Id.* ("'Waiver' shall mean the FCC Order WT Docket No. 10-2, in the matter of SHIPCOM LLC Request for Waiver, adopted by the FCC May 10, 2010, released May 12, 2010, and issued to the Company allowing among other things, the waiver of certain restrictions held on the maritime FCC licenses over land during emergencies and disasters as described therein.").

[16] *Id.* § 1.01.

[17] *Id.* § 5.11(a).

MIPA when they executed the FAMIPA.[18] The FAMIPA reflects the parties' agreement that Cellular would not pay its $5 million investment at closing, but instead would deliver a secured note for the purchase price (the "Note") following closing.[19] Given this deferred payment, the FAMIPA also provided that the Option would remain open for 60 days after two conditions are satisfied: (i) Cellular has paid the Note in full; and (ii) Cellular has delivered its operating agreement to the Option holders (Stiegler and Block). Specifically, the applicable provision of the FAMIPA reads:

> Exercise of Option. Subsection 5.11 (a) of the [MIPA] is hereby amended to provide that the time period during which the Option shall be exercisable shall commence on the date that the Note is paid in full by Purchaser and shall continue thereafter until 11:59 PST on the 60th day following the date that the Note is paid in full by Purchaser. Additionally, the provisions of (i) Section 5.11 (e) of the [MIPA] are hereby amended to require that the Purchaser deliver the USHFCC Operating Agreement to Sellers on or before the Purchaser's payment of the Note in full, and (ii) the provisions of Subsection 5.11(f) of the [MIPA] are hereby amended, such that from and after the Closing and continuing until the Note paid in full, the Company shall not become a subsidiary of any other entity other than the Purchaser, and the domicile of the Company's organization shall not be moved from the State of Alabama.[20]

---

[18] FAMIPA § 9.

[19] Id. § 2.

[20] Id. § 9.

7

On May 29, 2013, Cellular delivered the Letter Agreement to Block and Stiegler. Here, the parties state that they "entered into" the Letter Agreement "in connection with the payoff in full of the Note" delivered by Cellular to Block and Stiegler at closing.[21] They further agree that "[t]he final payment under the Note" would be wired to Block's and Stiegler's attorneys into a specified account.[22] Paragraph 1 of the Letter Agreement makes clear that "payment in full" of the Note means the $5 million acquisition price less certain offsets as set forth in Section 7.07 of the MIPA.[23]

Block and Stiegler agreed in the Letter Agreement that Cellular had not breached or defaulted under the MIPA, Note or other related agreements.[24] They also agreed that there were no existing conditions that would lead to default.[25]

> No Default. The Holders [Block and Stiegler] and ShipCom Nevada, LLC a Nevada limited liability company, on behalf of themselves and each of their heirs or assigns, hereby agrees and acknowledges that except as set forth in Section 4 below (the "Exclusion Items"), as of the date hereof there are no existing events of default by USHF or ShipCom

---

[21] Letter Agreement at 1.

[22] *Id.* ¶ 8.

[23] *Id.* ¶ 1; *see also* MIPA § 7.07. The MIPA required Cellular to pay Block and Stiegler $4,250,000, and to hold back $750,000 of the payment price to pay tax liens and specified losses (the "Holdback" amount). MIPA § 2.02(a). The MIPA later provides that the Offsets mentioned in the Letter Agreement are to be applied to the Holdback amount. *Id.* § 7.07.

[24] Letter Agreement ¶ 3.

[25] *Id.*

nor are there any events, conditions or acts which may result in a breach of, conflict with, constitute (with or without due notice or lapse of time or both) a default (collectively an "Event of Default"), under, or give rise to any right of termination, cancellation, or acceleration under the Agreement, Note, Pledge Agreement, Escrow Agreement, or that certain Commercial Lease between ShipCom Nevada LLC and ShipCom dated as of May 21, 2012. [26]

And, importantly, they "acknowledge[d] and agree[d] that they ha[d] . . . received a copy of the [Cellular LLC] Agreement in satisfaction of the covenants of [Cellular] in Section 5.11(e) of the [MIPA] and Section 9 of the [FAMIPA]."[27]

## C. The Alleged Breaches

After the deal closed, Cellular began to market its acquisition of the Waiver and its potential uses outside of ShipCom. For instance, Cellular stated in a private offering memorandum that it was "authorized by a FCC Waiver to operate on land when all existing forms of communication fail."[28] Cellular also admits that it entered into two agreements outside of ShipCom pursuant to which it intended to use "the FCC licenses and Waiver."[29] Block and Stiegler allege that the MIPA prohibits

---

[26] *Id.*

[27] *Id.* ¶ 7.

[28] Defs.' Opening Br., Ex. H at 11.

[29] Cellular's Second Am. Compl. ¶ 20; *see also* Defs.' Opening Br., Ex. I (Network Management Agreement) at 1.

Cellular from pursuing these business opportunities outside of ShipCom and they seek a declaration from the Court to that effect.

As for the Option issue, Block and Stiegler allege that the Option remains open because Cellular failed to deliver an operating agreement that complied with Section 5.11 of the MIPA. Specifically, they argue that the operating agreement tendered by Cellular lacked the capital structure referenced in Section 5.11(b) and lacked specific rights referenced in Section 5.11(e) of the MIPA. Since the delivery of a proper operating agreement is a condition to the running of the Option's 60-day expiration period, they seek a declaration that Cellular must honor their Options.

### D. Procedural History

On May 29, 2015, two years after the parties finalized their deal, Block and Stiegler sued Cellular in Alabama. They alleged that Cellular planned to exploit the Waiver for its purposes without ShipCom's permission. They also alleged that Cellular was not allowing ShipCom (and thus Block and Stiegler) to share in any potential profits related to the Waiver.

The conflict spilled into Delaware on August 3, 2015, when Cellular filed its complaint in this Court. In that complaint, Cellular sought declaratory and injunctive relief relating to the MIPA's substantive provisions and its Delaware forum selection clause. Block and Stiegler fired back in their answer and counterclaims, asserting claims for declaratory relief on the Maritime Business and Option issues. Various

motions and amended pleadings followed.  I need not review this history, or the full scope of the claims and counterclaims because, as noted, the parties have now stipulated to resolve all of the MIPA-related issues in dispute, except for those raised in their cross-motions for summary judgment.  Thus, this decision will mark an end to their conflict, at least in the Chancery theater.

## II.  ANALYSIS

I first address the standard of review applicable to these cross-motions for summary judgment.  I then address the two requests for declaratory judgment that remain in dispute.

### A.  Summary Judgment Standard

"There is no 'right' to a summary judgment."[30]  Rather, summary judgment is only appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[31]  "When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."[32]  In the procedural context of

---

[30] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[31] Ct. Ch. R. 56(c).

[32] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

cross-motions for summary judgment, in order to prevail, one of the parties "must establish that [its] construction is the only reasonable interpretation."[33]

Delaware "is more contractarian than many other states."[34]  Our courts first and foremost look "to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language."[35]  "[T]he presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."[36]

## B. "Maritime Business" Includes the Waiver

The MIPA unambiguously includes the Waiver in the definition of "Maritime Business."[37]  This means that ShipCom, and only ShipCom, retained the right to expand and develop its business operations surrounding the Waiver.  If Cellular has

---

[33] *Id.* (emphasis in original).

[34] *GRT, Inc. v. Marathon GTC Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011).

[35] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

[36] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007).

[37] MIPA at 2–3 (Recital); *id.* § 1.01.

utilized the Waiver in its business outside of ShipCom, then Block and Stiegler are entitled to share in any profits Cellular received from any such use of the Waiver.[38]

The analysis of this issue begins with the MIPA's Recitals where the parties agreed that ShipCom shall continue to operate and expand its "Maritime Business":

> Simultaneous with the Closing, the Company [ShipCom] shall form an operating subsidiary with the name ShipCom Maritime, LLC in the State of Delaware, with the Chief Operating Officer to be Stiegler, to operate the portion of the business of the Company that is currently engaged in the operation of the maritime FCC licenses **and** Waiver, and to expand the maritime business surrounding the maritime FCC licenses **and** Waiver (the "Maritime Business").[39]

This Recital language identifies two aspects of ShipCom's business: its "maritime FCC licenses" and the "Waiver." It unequivocally joins these two business components and places them squarely within ShipCom's "Maritime Business"—not once, but twice (as reflected in the highlighted text). Then, in its definition section, the MIPA refers to and incorporates the Recital language as the definition of "Maritime Business." Thus, the Waiver is included in the definition of Maritime Business. The MIPA's language on this point is clear and unambiguous. No other construction is justified under Delaware's strict contractarian regime.

---

[38] Specifically, the revenue should have gone through ShipCom. After expenses, ShipCom would then distribute funds to the interest holders, which are Cellular, Block and Stiegler.

[39] *Id.* 2–3 (Recitals) (emphasis supplied).

Cellular argues that Maritime Business does not include the Waiver because ShipCom was not "currently engaged" in the operation of businesses involving the Waiver at the time the parties entered into the MIPA.[40] This argument blinks at reality by ignoring the MIPA. The Recitals state that "[t]he first Beta Test [with respect to the Waiver] was performed [by ShipCom] at the 2012 Rose Bowl Parade" on January 2, 2012.[41] The parties go on to acknowledge that a "subsequent Beta Test is intended to be conducted in the near future . . . ."[42] Thus, the MIPA itself reveals that ShipCom was engaged in business activities related to the Waiver at the time the parties entered into the MIPA and that it intended to continue doing so.

Section 3.02 of the MIPA provides further evidence that ShipCom was "currently engaged" in developing business around the Waiver.[43] In Section 3.02(h),

---

[40] *See* Cellular's Opening Br. at 7–8; Pl. Cellular's Answering Br. in Opp'n to Defs.' Opening Br. 10–14. Cellular raises other arguments that are not persuasive in light of the MIPA's clear language. For instance, it argues that ShipCom did not actually use a subsidiary to operate its Waiver business. This argument relies on extrinsic evidence that the Court cannot consider to alter the plain meaning of the MIPA. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232–33 (Del. 1997) (holding that extrinsic evidence may not be offered to create an ambiguity in an unambiguous contract).

[41] MIPA at 2 (Recitals).

[42] MIPA at 2 (Recitals) ("A subsequent Beta Test is intended to be conducted in the near future and prior to the Beta Test, the administering federal agency or municipality and/or subdivision shall provide a Beta Test protocol in order that the Company [ShipCom] and Sellers can prepare and allow for an objective analysis of the Beta Test performance and results.").

[43] *Id.* § 3.02.

the MIPA provides that "Schedule 3.02(h) sets forth a correct and complete list and description of all Permits required to conduct the Business, as conducted on the date hereof including without limitation all FCC permits, licenses and waivers."[44] The MIPA defines "Business" as "the business of [ShipCom] **as conducted as of Closing**."[45] Schedule 3.02(h) includes the Waiver.[46]

Based on the foregoing, it is clear that ShipCom has the sole right under the MIPA to exploit the Waiver. This conclusion does not leave Cellular empty handed. Cellular bargained for and obtained an 80% interest in ShipCom. Thus, Cellular enjoys a substantial interest in profits derived from ShipCom's Maritime Business, including its Waiver-related operations. Block and Stiegler are entitled to share in those profits as well, however, as agreed to by the parties in the MIPA.[47]

---

[44] *Id.* § 3.02(h).

[45] MIPA § 1.01 (emphasis supplied). Notably, Cellular's Manager, Ed Bayuk, admitted in his deposition that ShipCom was actively marketing the Waiver before the parties executed the MIPA. Defs.' Opening Br., Ex. Q at 78:4–8 (Bayuk).

[46] Defs.' Opening Br., Ex. S (Schedule 3.02(h)).

[47] As previously noted, the MIPA requires that the parties pursue damages claims for breach of the MIPA in Delaware. MIPA § 9.09. This choice of forum provision is fully enforceable under Delaware law. *See Nat'l Indus. GP Hldg. v. Carlyle Inv. Mgmt. LLC*, 67 A.3d 373, 387–88 (Del. 2013) (confirming enforceability of Delaware forum selection clauses and endorsing the anti-suit injunction as a means to enforce the clause). Block and Stiegler do not seek damages in this action, however. Defs. Block and Stiegler's Am. Countercl. ¶¶ 50–54. Thus, I have no basis to award damages in connection with the declaratory judgments that will issue in connection with this Opinion. With that said, if any such claims are to be prosecuted, assuming they remain viable, they must be brought in Delaware.

15

## C. The Option has Expired and is no Longer Exercisable

To address the Option issue, the Court must traverse through three agreements between the parties: the MIPA, FAMIPA and Letter Agreement. As explained below, the clear and unambiguous language of these agreements reveal that the Option's 60-day clock was triggered years ago, but Block and Stiegler did not act to exercise their rights on time.

The MIPA originally provided for the Option in Section 5.11. Section 5.11(a) states that "[f]ollowing Closing, the Sellers [Block and Stiegler] shall each have a several option . . . which shall not exceed sixty (60) days following the Closing Date [] at which time such Option shall terminate . . . ."[48] The Option is tied to investment thresholds. Accordingly, Section 5.11(b) expressly incorporates language from the Recitals that requires Cellular to use its "best efforts" to obtain third-party investment in Cellular.[49] At Section 5.11(e), Cellular agrees that it "shall deliver to [Block and Stiegler] the limited liability company agreement of [Cellular] . . . in order that [they] may review [sic] in anticipation of exercising the

---

[48] MIPA § 5.11(a).

[49] *Id.* at 2 (Recitals) ("The Purchaser [Cellular] shall use its best efforts prior to Closing, to bring in a private equity third party investor or investors (the 'Third Party Investor') that shall commit to funding Purchaser with up to an aggregate of Thirty Million Dollars ($30,000,000) whereby the Purchaser shall be then owned [in specified percentages]."); *id.* § 5.11(b) ("As stated in the Recitals to this Agreement, the Purchaser [Cellular] at the time of Closing, shall be owned [by the Third Party Investor and others in the specified percentages].").

16

Option."[50]  This section further provides that the operating agreement "shall not be subject to change or negotiation as a condition to the exercise of the Option . . . ."[51]

The FAMPIA reflects the parties' agreement that the Purchase Price, as defined in the MIPA, would be paid by a Note rather than by "wire transfer of immediately available funds."[52]  It also amends Section 5.11 of the MIPA by providing that "the time period during which the Option shall be exercisable shall commence on the date that the Note is paid in full by [Cellular]" and shall continue for 60 days.[53]  It retains the requirement in the MIPA, as a precondition to the trigger of the 60-day clock, that Cellular "deliver the [Cellular] Operating Agreement to [Block and Stiegler] on or before [Cellular's] payment of the Note in full."[54]

The Letter Agreement, dated May 29, 2013, is the final agreement relevant to the Option issue.  It confirms that Block and Stiegler had received the operating agreement specified in the MIPA and FAMIPA,[55] and that Cellular was wiring funds

---

[50] *Id.* § 5.11(e).

[51] *Id.*  The parties agreed that the Cellular operating agreement shall provide Block and Stiegler with certain rights, such as the right to participate in future issuances.  *Id.* As discussed below, the Letter Agreement expressly states that the Cellular operating agreement delivered to Block and Stiegler satisfied this provision.  Letter Agreement ¶ 7.

[52] MIPA § 2.02; FAMIPA § 2.

[53] FAMIPA § 9.

[54] *Id.*

[55] Letter Agreement ¶ 7.

to Block and Stiegler as "payment in full" of the Note.[56]  It appears that the wire transfer occurred on May 30, 2013.[57]  Block and Stiegler signed the Letter Agreement on May 31, 2013.[58]  It is indisputable, therefore, that the two events required to start the 60-day "Option clock," as specified in the FAMIPA, had occurred by May 30, 2013.[59]  Block and Stiegler took no action within 60 days of May 30, 2013; indeed, they still have not properly attempted to exercise the Option.[60]  Thus, the Option clock ran out long ago, and the Option is no longer exercisable.

Block and Stiegler now argue that they could not exercise the Option because Cellular did not satisfy a condition precedent.  Specifically, they argue that the operating agreement Cellular delivered did not reflect the capital structure described

---

[56] *Id.* ¶ 8.

[57] *See* Defs. Block and Stiegler's Answering Br. in Opp'n to Cellular's Opening Br., Ex. A; Cellular's Opening Br. at 19 (quoting Stiegler Deposition 16:13–17:3).

[58] Letter Agreement at 4 (Signature Pages).

[59] I note that the parties recently stipulated that the Note was "paid in full" as of August 10, 2015.  Stipulation and Order of Declaratory Judgment 1.  Block and Stiegler disputed how much they were owed from the holdback amount after tax liens and other expenses were paid.  But they conceded that their disagreement regarding the amount owed was not a material fact for the Court to consider in evaluating the Option issue.  Defs. Block and Stiegler's Answering Br. in Opp'n to Cellular's Opening Br. at 5 n.1.  Nevertheless, even if the Court uses August 10, 2015 as the start date of the 60-day clock, the Option is still long past expired.  And Block and Stiegler have not presented any evidence that they attempted to exercise the Option within 60 days from that date.

[60] *See supra* note 59.  Indeed, Stiegler testified at deposition that he and Block consciously decided not to exercise the Option.  Cellular's Opening Br. at 19 (quoting Stiegler Dep. at 104:18–105:15).

18

in Section 5.11(b) and did not contain rights described in Section 5.11(e) of the MIPA. I reject that argument because (i) it has no bearing on the FAMIPA's express terms regarding the Option clock; (ii) Section 5.11(b) of the MIPA only required Cellular to use its "best efforts" to secure investments;[61] (iii) Block and Stiegler agreed that the operating agreement as delivered would not be subject to change;[62] and (iv) they have already agreed that the operating agreement they received satisfied the covenants set forth in the MIPA and FAMIPA.[63]

Even if I ignore the "best efforts" language, Block and Stiegler would only have a claim for breach of contract if Cellular had not achieved the capital structure as described in Section 5.11(b) of the MIPA. But they have already acknowledged, in a signed agreement, that Cellular has met this (and all other) conditions relating to the Option.[64] Moreover, the operative 60-day clock is the one set forth in

---

[61] *See* MIPA at 2 (Recitals), § 5.11(b). Block and Stiegler have not alleged and do not argue that Cellular failed to use its best efforts.

[62] MIPA § 5.11(e).

[63] Letter Agreement ¶¶ 3, 7. Paragraph 3 of the Letter Agreement states that Cellular had satisfied all conditions under the MIPA. And Paragraph 7 states that the operating agreement Cellular delivered satisfied the covenants in Section 5.11(e) of the MIPA and Section 9 of the FAMIPA (which sets forth the 60-day clock).

[64] Block and Stiegler agreed in the Letter Agreement, after they acknowledged receipt of a proper operating agreement, that Cellular had satisfied all conditions under MIPA and was not in breach of the MIPA. Letter Agreement ¶¶ 3, 7.

Section 9 of the FAMIPA, and Section 9 does not mention capital structure.[65] Finally, I reiterate that the MIPA expressly states that the Cellular operating agreement (as delivered) was not subject to change or negotiation.[66] Based on these unambiguous provisions of the operative agreements, it is clear that the Option has expired and is no longer exercisable.

## III. CONCLUSION

Based on the foregoing, Block and Stiegler's motion for summary judgment on the Maritime Business issue is GRANTED. Cellular's motion for summary judgment on the Option issue is also GRANTED. The parties shall confer and submit an implementing order rendering final judgment within the next ten (10) days.

**IT IS SO ORDERED.**

---

[65] FAMIPA § 9.

[66] MIPA § 5.11(e); FAMIPA § 12 (stating that provisions of the MIPA not amended "shall remain in full force and effect.").